FILED

2016 MAY 27  P 1: 51

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| **JULIE SAPP**<br>**707 Belmont Bay Drive**<br>**Woodbridge, Virginia 22191,**<br><br>       **Plaintiff,**<br><br>       **v.**<br><br>**BOARD OF REGENTS OF THE**<br>**UNIVERSITY SYSTEM OF GEORGIA,**<br>**270 S. WASHINGTON ST., S.W.**<br>**ATLANTA, GEORGIA 30334**<br><br>**Serve:**<br><br>       **Hank M. Huckaby, Chancellor**<br>       **Board of Regents of the**<br>       **University System of Georgia**<br>       **270 Washington Street, S.W.**<br>       **Suite 7025**<br>       **Atlanta, Georgia 30334**<br><br>       **Samuel C. Burch, Vice Chancellor**<br>       **for Legal Affairs**<br>       **Board of Regents of the**<br>       **University System of Georgia**<br>       **270 Washington Street, S.W.**<br>       **Suite 7025**<br>       **Atlanta, Georgia 30334**<br><br>       **Sam Olens, Attorney General**<br>       **Office of the Attorney General**<br>       **40 Capitol Square, S.W.**<br>       **Atlanta, Georgia 30334**<br><br>       **Defendant.** | **Case No.** 1:16cv589<br><br>CMH / IDD |

## COMPLAINT FOR EQUITABLE AND
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Julie Sapp, by and through counsel, hereby files her Complaint against the

Board of Regents of the University System of Georgia, d/b/a Georgia Institute of Technology,

d/b/a Georgia Tech Research Institute (collectively, "GTRI") for violations of Title IX of the

Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* and the regulations and

policies promulgated here under, see 34 C.F.R. §106 *et seq.*, the Rehabilitation Act of 1973, 29

U.S.C. § 701, *et seq.*, and the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d).

### Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because this is an action arising under the laws of United States, specifically, Title IX, the

Rehabilitation Act, and the EPA.

2.      This Court has personal jurisdiction over GTRI because it has substantial

contacts with and transacts significant business within the Commonwealth of Virginia.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts that

form the basis of this complaint occurred in this District and this Division and a majority of the

witnesses involved in this matter are in this District and Division.

### Parties

4.      Plaintiff is a resident of Prince William County in the Commonwealth of

Virginia and is a citizen of the United States.

5.      The Board of Regents of the University System of Georgia is the single

governing and management authority of public higher education in the state of Georgia.  It

maintains its headquarters in Atlanta, Georgia.

6. The Georgia Institute of Technology is a research and technological university which has its principal location in Atlanta, Georgia.

7. Georgia Tech Research Institute is a division of the Georgia Institute of Technology and maintains its headquarters in Atlanta, Georgia.

8. GTRI has offices in the Commonwealth of Virginia, including in Fairfax County and in Prince William County, Virginia.

9. The Board of Regents of the University System of Georgia governs, manages, and controls the Georgia Institute of Technology and consequently GTRI and employs the President, administrators, and employees of Georgia Tech and employs the Director and employees of GTRI.

10. Georgia Tech and the Georgia Tech Research Institute receive substantial funding from the United States federal government.

11. The Board of Regents of the University System of Georgia is an educational institution for purposes of Title IX.

## Factual Allegations

12. Sapp is a female who lives in Woodbridge, Virginia.

13. Sapp earned a Bachelor's of Science degree in Aerospace Engineering from Georgia Institute of Technology in 2005.

14. Sapp earned a Master's degree in Aerospace Engineering with a concentration in Systems Engineering in 2009 from the Georgia Institute of Technology.

15. Sapp earned a Master's degree in Business Administration in 2009 from the Georgia Institute of Technology.

16.     Upon her graduation, Sapp accepted a position with Booz Allen Hamilton in Northern Virginia.

17.     In 2011, Sapp began looking for alternate employment.

18.     One of Sapp's goals was to eventually relocate to Atlanta, Georgia.

19.     At the end of 2011, Terence Haran, GTRI's Rapid Equipping Force's Project Manager, interviewed Sapp. Haran became Sapp's second level supervisor and is located in Atlanta, Georgia. Haran visits the REF in Fort Belvoir, Virginia, once or twice per month.

20.     Joe Rozmeski, the REF Research & Analytics Director (and the Government client representative on the contract supporting the position for which Sapp interviewed), also interviewed Sapp. Rozmeski became Sapp's, Ryan Vangel's, and Lee Gazzano's government client supervisor under the REF contract. He is located in Atlanta, Georgia.

21.     Vangel is a Senior Research Associate and Sapp's direct supervisor in an administrative capacity at GTRI. He is responsible for the administrative issues and not the actual work product conducted by GTRI team members. He is located on site at Fort Belvoir, Virginia.

22.     Gazzano was the GTRI team Task Manager for the REF client, was responsible for overseeing Sapp's work product under the REF contract, and was located on site at Fort Belvoir, Virginia until he left GTRI in March 2016.

23.     During the interview process, Haran and Rozmeski assured Sapp that she could maintain a flexible work schedule, to include working from home.

24.     During the interview process, Haran promised Sapp the opportunity to relocate to Atlanta within 18 months while maintaining the same base salary.

25.     GTRI hired Sapp as a Research Engineer II in February 2012.

4

26.     Sapp began working as a Project Engineer at the Government client's REF facility in Fort Belvoir, Virginia in February 2012 and left the Fort Belvoir site on January 29, 2016, after her position and three others were moved to a new contract supported by a different company. In about April 2013, Sapp's REF title changed to Research Analyst.

### GTRI employees at the REF site perpetuated a culture of profane comments in the workplace.

27.     In early 2012, Vangel told Sapp other male employees of the REF stated that Sapp should "wear [her] hair in pigtails." When asked why he said this, Vangel responded "you should hear the things they say about you," in reference to the other men working at the REF.

28.     Sapp confronted a few of the "men" cited by Vangel, including Jared Bolton and Steve Hill. They corroborated that the statements were made, but claimed Vangel was the instigator.

29.     While few inappropriate comments of a sexual nature were said in front of Sapp, she was aware that they were said behind her back.

30.     Andrea Johnson told Sapp that Rozmeski was "partial to hiring attractive young females," even if a more qualified but potentially less attractive woman should be hired. Johnson was a Research Associate I under the same contract as Sapp. They were considered equals. She was located at the Fort Belvoir, Virginia REF location. In late 2012, she left GTRI to work for another contractor, but still works at the Fort Belvoir, Virginia location.

31.     Johnson also told Sapp that upon being hired in an administrative capacity, Rozmeski told Johnson that "he preferred [Johnson] over Jen Masson," even though Masson was more qualified for the position.

32.     Further, Rebecca Melber was hired as a Research Associate I over a much more qualified male engineer. Melber's REF title was also Research Analyst. Gazzano had pushed for

5

the other candidate, but Rozmeski and Vangel were insistent upon Melber. Melber was located at the Fort Belvoir, Virginia REF location through January 2016 and currently works in a different role within GTRI.

33.     Sapp learned of this from Melber, who had been told that there were people at the REF, like Dr. Karen Harrington, among others, who did not think Melber was qualified for the position when she was hired. Harrington is the Science Advisor at the REF. She is one of Sapp's government client supervisors. She is located at the Fort Belvoir, Virginia location.

34.     Further, per Federal Acquisition Regulations, the government is not permitted to have any say in the hiring or firing decisions of their contractors. However, in order to please the government client, Haran would frequently allow Rozmeski to interview potential employees and weigh in on hiring decisions.

**Sapp has an exemplary start at GTRI**

35.     From February 2012 through March 2015, Sapp worked under the Deputy Director of Research Operations Directorate. Sapp's team was restructured several times during her tenure. From February 2012 through April 2013, the team was named Technology Management and overseen by Gary Frost and Joe Rozmeski. In 2013, Sapp became part of the Science and Technology division overseen first by Harrington, then by Major Tyrone Lastrapes, and then again by Harrington. Lastrapes oversaw the work product of the Research & Analytics team under the REF contract, was one of the government clients, and was Sapp's direct supervisor. In late 2013, Sapp was part of the Research and Analytics team overseen by Rozmeski until December 2015. The team was again reorganized under the title Outreach and Assessments, and fell under Lieutenant Colonel Scott Schumacher. At all times, the divisions were run by the REF out of Fort Belvoir, Virginia.

36.     Upon beginning at GTRI in February 2012, Sapp inquired about a flex schedule and teleworking from her onsite supervisor, Ryan Vangel.

37.     Vangel stated that flex schedules were not allowed and Sapp was required to be onsite every day from 8:30 a.m. to 4:30 p.m.

38.     Sapp was immediately productive and performed excellent work. Her duties included working on several projects at once. One project at this time was the Nano Unmanned Aerial Systems (UAS) Study and another was the Water in a Box project.

39.     Sapp's government client gave her excellent reviews of her work. For example, Frost emailed Sapp in mid-2012 stating he was very pleased with her work and "[wished he] had four more Julie's."

40.     Sapp also received verbal praise from Harrington, Colonel Newell, and Colonel Steven Sliwa.

41.     GTRI also expressed their pleasure with Sapp's work.

42.     For example, in August 2012, Sapp received her performance evaluation. Vangel and Haran were present at the meeting, and Marty Broadwell attended by phone.

43.     Broadwell was the Deputy Director of Research Operations at GTRI and is currently in a senior leadership role. He was Sapp's third level supervisor from the time of her hire until February 2015 and he is located in Atlanta, Georgia.

44.     Haran's comments stated that Sapp had done an amazing job and the government client was very pleased.

45.     After that meeting in August 2012, Haran took Sapp aside and said that he was submitting the paperwork so she would receive a raise.

46.     This was less than a year after Sapp started at GTRI. GTRI does not typically issue raises within the first year of employment and had not provided institute-wide raises in years.

47.     Prior to the spring of 2012, there were four people on Sapp's team (including her) serving in the same position as Sapp.

48.     In the spring/early summer of 2012, the three other employees serving in the same position as Sapp were fired or left the contract.

> a.  Gill Autmon had made a mistake in which he had loaded classified information on an unclassified system. He was forced into retirement.
>
> b.  Alex Lee left GTRI for a different position.
>
> c.  Joe Saur was fired.

49.     Since Sapp was the only remaining team member at this time, Sapp completed the majority of work assigned under the government contract for the entire spring and summer through September 2012. This included all projects that Autmon, Lee, and Saur had been working on, as well as a new and large scale project called Water in a Box (sustainable tactical water). During this time Sapp was carrying the workload of four people.

50.     In August 2012, Sapp received a 5/5 performance rating at her annual review.

51.     Sapp did not receive any additional compensation for completing the increased workload at the time.

52.     In September 2012, GTRI hired Gazzano, Marty Chavers, and Michael Herndon for the government contract.

> a.  Gazzano was employed by GTRI and was Sapp's direct supervisor over work projects.

8

b. Chavers was hired as a Senior Research Associate under the same contract as Sapp at the Fort Belvoir REF location and was her equal. They worked on extremely similar tasks and their work required equal skill, effort, and responsibility. Chavers' REF title was also Research Analyst. Chavers left GTRI in September 2014.

c. Herndon was hired as a Research Associate under the same contract as Sapp at the Fort Belvoir REF location and was her equal. Herndon's REF title was also Research Analyst. Herndon and Sapp worked on extremely similar tasks and their work required equal skill, effort, and responsibility. He would frequently come to Sapp and complain about how bored he was due to lack of work.

d. Johnson was also moved from an administrative position to a Research Associate I. Johnson's REF title was also Research Analyst. She and Sapp were considered equals. She had never performed in this capacity before and was not as efficient as Sapp due to her inexperience and education.

53. Sapp was routinely assigned more work than her male counterparts by Gazzano and Rozmeski.

54. While Gazzano officially assigned tasks to Sapp and her teammates, Rozmeski, as the government client representative, often weighed in on whom he wanted to complete a specific job. He would often ask that Sapp complete certain tasks because he knew she would do the job well.

**GTRI Institutes a new flex leave policy**

55.    Saur had used flex time to leave by noon on Fridays in order to return to his family in Norfolk, Virginia. He maintained this arrangement throughout his employment at GTRI on the REF worksite.

56.    Dr. Amy O'Brien used flex time to record enough working hours during the month (specifically in July or August 2012) so that she could take a week off without using her leave. O'Brien was a GTRI employee on the same contract as Sapp. However, she was fired from the REF contract in 2013. She now works for another contractor in Virginia.

57.    Through September 2012, Sapp had typically used up to two flex days per month to balance her hours given the increasingly long work days necessary to meet client requirements.

58.    In October 2012, due to what was perceived as an abuse of the flex policy by O'Brien, Haran implemented a new policy preventing the use of more than one flex day per month, unless permission had been specifically granted by Haran or Vangel.

59.    The policy also included banning work days over 9 hours without explicit permission or approval in advance from Vangel, Gazzano, or Haran.

60.    Sapp had in person conversations with Vangel and Haran in which she challenged the new policy and asked for clarification on how the policy would be administered.

61.    Sapp, along with some of her male colleagues including Herndon, protested the new policy in separate emails to Haran and Vangel on October 26, 2012.

62.    As part of the continued frustration over the flexible work schedule, Sapp mentioned in person (and in confidence) to Vangel that she might have to find a new job if she could not work out the scheduling issues.

63. This was an attempt to encourage a change or renewed discussion over the policy.

64. After hearing this comment, Vangel told Haran of Sapp's comment.

65. Haran then took Sapp aside and said that he removed the raise paperwork for Sapp and would not return it until she stopped objecting to the new policy.

66. Sapp ceased her public objections to the policy.

67. Sapp subsequently received a raise in February 2013.

68. While on a visit to the REF in January 2013, Haran quipped that it was "the fastest raise in GTRI history."

**Sapp goes on maternity leave for the first time**

69. Sapp's first son was born on May 31, 2013.

70. Sapp went on maternity leave from May 31, 2013 through September 11, 2013.

71. Before leaving for maternity leave, Sapp emailed Vangel to request access to a room in which she could express breast milk upon her return from maternity leave.

72. In her email, dated May 20, 2013, Sapp cited federal law, incorporated by the state of Georgia, regarding employer requirements as applied to nursing mothers. Sapp provided links for Vangel to review the applicable statutes.

73. A link in Sapp's May 20, 2013 email led to the National Conference of State Legislatures webpage containing descriptions of state laws on breastfeeding and lactation activities. The webpage included a description and summary of various statutes, including Section 4207 of the Fair Labor Standards Act (29 U.S.C.§207), Ga. Code § 34-1-6 (1999), and Va. Code § 2.2-1147.1 (2002, 2015), including the following:

a. Section 4207 of The Fair Labor Standards Act (29 U.S.C.§207) requires an employer to provide reasonable break time for an employee to express breast milk for her nursing child for one year after the child's birth each time such employee has need to express milk.

b. Ga. Code § 34-1-6 (1999) allows employers to provide daily unpaid break time for a mother to express breast milk for her infant child. Employers are also required to make a reasonable effort to provide a private location, other than a toilet stall, in close proximity to the workplace for this activity. The employer is not required to provide break time if to do so would *unduly* disrupt the workplace operations.

c. Va. Code § 2.2-1147.1 (2002, 2015) was summarized as guaranteeing a woman the right to breastfeed her child on in any place where the mother is lawfully present, including any location where she would otherwise be allowed on property that is owned, leased or controlled by the state. The bill also stipulates that childbirth and related medical conditions specified in the Virginia Human Rights Act include activities of lactation, *including breastfeeding and expression of milk by a mother for her child.* (HB 1264, HB 1499)

74.     Vangel told Sapp that he consulted with Haran on the issue.

75.     Vangel then told Sapp that Haran concluded that the regulations didn't apply to Sapp, and that Sapp should just pump in the bathroom like women had done previously.

76.     In a conversation overheard by Johnson and O'Brien, Vangel told Sapp that she should use the bathroom like other women had done previously.

77.     After a lengthy exchange over the issue, Sapp was finally granted permission to use a specific room for pumping milk. Vangel and Gazzano made the arrangements prior to Sapp's return from maternity leave.

78.     The designated room was a conference room with a lock on the door.

79.     The conference room had a sign-up sheet on the door. Sapp reserved the same times every day in order to express breast milk.

80.     However, the room was often being used for meetings when Sapp needed to pump.

81.     On several occasions, Lieutenant Colonel Shannon Jackson was holding a meeting, in person and via teleconference, in the conference room at Sapp's reserved timeframe.

82.     When Sapp arrived to express breast milk, Jackson shrugged and directed Sapp to find another location. He refused to relocate or honor the reservation on the sign-up sheet.

83.     On several occasions, a REF employee for a contractor other than GTRI named Hope was occupying the conference room.

84.     When Sapp arrived to express breast milk, Hope refused to leave and told Sapp to "come back later."

85.     Sapp informed Vangel, in person, of each instance as they occurred.

86.     Vangel took no action.

87.     As a result of others using the conference room, Sapp was forced to find an alternate location to pump. This often required her to leave the REF and walk several blocks to find another suitable room.

88.     Additionally, when Sapp was able to use the room, other employees would often try to enter the conference room while she was expressing breast milk.

89.     While expressing breast milk, Sapp placed a sign on the conference room door, indicating that it was occupied for the purpose of expressing breast milk and advising other employees not to enter.

90.     Despite the sign, people frequently knocked on the door or attempted to enter the conference room while it was occupied by Sapp and inquired as to when she would be vacating the room.

**Sapp is subjected to disparate treatment because she is a woman**

91.     Prior to Sapp leaving on maternity leave in 2013, the Government client, Lastrapes, requested Sapp be able to work from home in the weeks prior to her return from maternity leave.

92.     Sapp relayed Lastrapes in person request to Haran via email.

93.     Haran denied the request because, in his words, "the contract didn't support telework."

94.     At the same time, a colleague of Sapp's, Jesse Hester, was permitted to work from home.

95.     Hester has worked at GTRI since 2010. He provides specific project support to the REF under project-funded contracts. He has continuously refused to work on site. GTRI has allowed him to work off site for most of the time, only requiring him to be on site occasionally in order to please the government client.

96.     Haran justified denying Sapp's request by saying Hester was on a different contract that was project-funded.

97.     However, the government contract under which Sapp works does not specifically forbid teleworking. In fact, it does not address teleworking at all.

98.     Under the contract, Sapp's work is mostly on site; however, there was no objection from the government client, Lastrapes, to Sapp occasionally completing her work at home.

99.     Vangel further stated that Sapp could not work from home because the government client would object. However, it was the government client that made this specific request for Sapp to work from home.

100.    The policy requiring GTRI employees to work on site at the REF was not government imposed. In fact, several government representatives, including Lastrapes, Harrington, and Kurt Frulla, had encouraged teleworking.

101.    The nature of Sapp's work required that she review large documents, locate and interview subject matter experts over the phone, and conduct research. Since Sapp was assigned mostly independent work or her collaborators were not onsite at REF, there was not a legitimate business reason that she would not be able to complete most of her tasks off site. Additionally, the work environment at the REF was not conducive to a high level of productivity. The open floor plan created a loud and disruptive work environment.

102.    Sapp may have been more efficient if permitted to work off site.

103.    In August 2013, Sapp's father fell terminally ill.

104.    Sapp texted Vangel in August 2013, requesting to be allowed to telework for two to three days a week upon her return from maternity leave to take care of her father as well as care for her new baby. Sapp proposed that she be transferred to a project funded contract that would support telecommuting.

105.    Sapp suggested in her proposal that one of her large scale projects could be configured from part of the open support contract to its own project-funded contract.

106.     Haran again denied Sapp's request.

107.     Haran then stated that "historical precedent," not the project funded contract, was the reason Hester was allowed to work from home.

108.     Sapp's father passed away the day before her return from maternity leave.

109.     Sapp texted Haran to ask for additional days off to cope with the loss of her father, and specifically asked if bereavement leave was available.

110.     Vangel discussed Sapp's available leave with Sapp, but no additional leave was provided and she was not offered an option to take additional time off.

111.     Haran added that GTRI policy did not allow bereavement leave.

112.     While on maternity leave, Sapp was also diagnosed with post-partum depression.

113.     In August 2013, Sapp's therapist submitted the required paperwork to GTRI's human resources department requesting Sapp be given flexibility to attend her weekly appointments.

114.     Due to her medical condition, Sapp's therapist also requested that Sapp be allowed to arrive at the office at 11:00am for two days during the week in order to attend her therapy appointments for post-partum depression. Sapp proposed to Vangel to work from home for two hours on those mornings in order to maintain productivity and be able to work her full hours given that she did not have leave accrued following maternity leave and her father's death.

115.     After consulting with Haran, Sapp's request to modify her schedule to accommodate her appointments was denied.

116.     Neither Vangel nor Haran offered alternative options for Sapp to be able to accommodate her appointment schedule.

117.    Despite not allowing Sapp any flexibility to arrange her schedule around her therapy appointments or caring for her father, GTRI management (including Vangel and Haran), permitted Chavers, a male colleague of the same level as Sapp and on the same contract, to rearrange his work schedule in order to attend his physical therapy appointments and to tend to his diabetic wife when she could not be left home alone.

118.    Chavers never encountered a problem with taking time to attend personal appointments or to care for his ailing wife.

119.    Chavers was allowed to arrive late, work late, and telecommute on short notice.

120.    Additionally, Herndon, a male colleague on the same level as Sapp and on the same contract, was permitted to work from Atlanta, Georgia for one to two weeks when his parents fell ill.

121.    Vangel supported Herndon's trip to Atlanta, "pushing additional work" to Herndon to ensure Herndon could work during his time away from the REF site and therefore conserve his leave time. Vangel and Sapp had a discussion in which Vangel explained this to Sapp. Additionally, Eric Wierzba, a male colleague on the same level as Sapp and on the same contract, was permitted to rearrange his schedule to arrive at the office at 9:00am or later because he needed to drop his children off at daycare.

122.    Wierzba is a Senior Research Associate on the same contract as Sapp at the Fort Belvoir REF location.  They were considered equals. Wierzba's REF title was also Research Analyst. They worked on extremely similar tasks and their work required equal skill, effort, and responsibility.  Wierzba left GTRI in January 2016.

123.    Wierzba had no difficulty getting approval from Vangel in order to alter his work schedule.

124.     Vangel continually insisted Sapp be present in the office from 8:30am until 4:30pm.

125.     On one occasion in October 2013, Sapp arrived at work sick.

126.     The government client representative, Harrington, told Sapp to return home and telework during that day.

127.     Vangel consulted Haran and they did not approve the teleworking. Vangel stated that the client did not have the authority to dictate where GTRI staff worked but allowed Sapp a single exception in this case to preserve the GTRI client relationship.

128.     Gazzano had told Sapp that as part of his personal work philosophy, Haran despised the idea of any employee working from home.

129.     However, in spring 2014 Herndon requested an alternate work schedule that would allow him to stay in Atlanta one week per month.

130.     Vangel told Sapp that he and Haran were seriously considering Herndon's request. However, the Government client, Rozmeski, did not support the request. So, the request was eventually denied.

**GTRI evaluates Sapp using different criteria than her male teammates**

131.     GTRI issued raises to Sapp's team in June 2014.

132.     Sapp received a 2.4% raise.

133.     Herndon received a 7% raise.

134.     Chavers received a 4% raise.

135.     During the evaluation period from which the raises were considered, Sapp had been assigned much more work than Herndon and Chavers.

    a.     Chavers only had one project, called 4GLTE.

b. Herndon had only intermittent work. He would often wander about and frequently told Sapp he was bored.

c. Sapp's projects during this time frame included the following:

    i. Water in a Box: a large scale and highly visible project aimed at providing sustainable water solutions to soldiers in combat situations.

    ii. Expeditionary Waste Water Reuse: Sapp managed a variety of programmatic tasks and studies to include cost benefit analyses and a policy assessment.

    iii. Improving Mission Analysis at the REF.

    iv. Assisting with strategic planning within the REF.

136. Sapp asked Vangel as to why her raise was lower than Herndon and Chavers.

137. Vangel said that it was rude for her to ask other people what their raises were.

138. Vangel then replied that the raises were not based on merit, but declined to give further information regarding the raise calculations.

139. Sapp held a teleconference in June 2014 with her third level supervisor, Broadwell to discuss the raise criteria.

140. Broadwell stated the following

a. There was no real evaluation criteria; however, if you had previously received a raise, you were at a disadvantage.

b. Raises were determined by feedback from Vangel and Haran, but not Gazzano (the task manager who worked most closely with the team), or any of the relevant government client representatives.

c.  There were no performance concerns about Sapp's work, but her "consistent availability" was an issue.

141.    Sapp asked Broadwell to clarify what the "consistent availability" issue was.

142.    In response, Broadwell stated words to the effect of, "I'm trying to stay within the bounds of what I can say and divulge legally. You know how the REF operates. Urgent things come up and you need to be available immediately for impromptu meetings."

143.    Sapp asked if Broadwell was referring to the fact that she needed to pump breast milk two to three times a day.

144.    Broadwell responded, "That would be an accurate assessment."

145.    Upon Sapp's further questioning of Vangel regarding his comments on her availability, Vangel justified his criticisms on Sapp's availability by citing three days in January 2014 when Sapp was provided time by Vangel to assist her mother after her mother's house burned down.

146.    Vangel claimed that Rozmeski had asked him where Sapp was during that time. However, Sapp had informed the entire REF of her mother's situation and the timeframe for her brief absence to assist her family.

147.    As a result, the REF took up a collection to support Sapp's mother though this difficult time.

148.    Vangel further justified his comments by citing a few instances when Sapp arrived after 9:00am, but could not provide specific dates or examples.

149.    On the occasions mentioned by Vangel described immediately above, Sapp had informed the government client, Vangel, and the team of her absences. Sapp never received any complaints regarding her absence or late arrivals.

150.     In August 2014, Sapp received 4 out of 5 on her 2014 performance review. The evaluation period covered the July 2013 through June 2014 time frame.

151.     Herndon received 5 out of 5 on his 2014 performance review, despite performing less work, and less complicated work, than Sapp.

152.     Sapp had received comments from various government client representatives indicating that they were very pleased with Sapp's work.

153.     Sapp asked Vangel if he had interviewed any of the Government clients that Sapp worked closely with, including Lieutenant Colonel Steve Delgado, Major Jennifer Zais, Lieutenant Colonel Ken O'Donnell, Harrington, or Gazzano, her GTRI task lead, when evaluating her performance.

154.     Zais is the Solution Team Acquisition lead at the REF. She supervises Sapp and one of the government clients.

155.     Vangel and Haran did not interview any of the above parties regarding Sapp's work product.

156.     Vangel then claimed that the negative comments that downgraded Sapp's performance review were due to an interaction between Sapp and Major LaShawn Langford, a person with whom Sapp had limited professional interaction, and further stated that the feedback was based on an interview between Haran and Langford.

157.     When Sapp asked Gazzano about his thoughts on the incident, Gazzano queried Haran for insight, and Haran had no idea what Vangel was referencing.

158.     When Sapp confronted Vangel again regarding the interaction with Langford, Vangel admitted that no one had mentioned it to him in a performance review interview. Vangel

had witnessed the negative interaction and failed to correct the behavior at the time of the incident.

159.    In September 2014, at Sapp's request, Vangel, Haran, and Gazzano met with her to discuss resolution of her complaints.  In particular, Sapp complained about the disparity in raises between herself and her male colleagues. Haran was dismissive of her request, indicating she was "not entitled to clarity" in either the appeal or raise processes, that she should be "happy with [her] appraisals and salary," and that she was already "well-paid."

**Sapp is commended and then reprimanded when her male colleagues were not**

160.    In October 2014, Sapp was assigned a large project to complete with a very short deadline.

161.    Since Vangel was out of the office during that week, Gazzano and Rozmeski granted Sapp permission to take the work home to complete in order to ensure the deadline could be met.

162.    Sapp completed the majority of the assignment before the one week deadline.

163.    The Government client commended Sapp on her great performance on such a short deadline.

164.    Upon Vangel's return the following week, Sapp requested to work from home during the afternoon, due to an offsite meeting and doctor appointment, so she could finalize the deliverable Gazzano and Rozmeski approved for telework and to conserve as much time to work as possible in light of the distance between all three locations.

165.    Vangel denied the request on October 15, 2014 in an email stating "no additional offsite work is authorized. Please find another way to finalize your CBA feedback in the allotted time."

166.    Sapp responded to Vangel in an email, "Do you realize how much work I got done in less time than was originally allotted? I was allotted an entire week plus Columbus Day to get it done. [My son] was sick two of those days, both of which I used leave. Those are two days originally allotted for offsite work that I didn't get an opportunity to use. I'm almost done, and will have it completed in a fraction of the time I anticipated."

167.    Following this email, Vangel, whose desk was to the immediate right of Sapp's, turned around and continued the conversation with Sapp verbally.

168.    The exchange between Vangel and Sapp became heated.

169.    Vangel told Sapp to find another way to accomplish the task while on site.

170.    Sapp responded that it would be an inefficient use of time to drive to the off site appointment, which was near her home, and then all the way back to the REF for only one more hour of work. The work would be completed efficiently and on time in the remaining two work hours of the day if Sapp worked from home.

171.    After Vangel again stated that 'this is not a viable option,' Sapp became visibly frustrated with him and at one point stated "leave me alone" and "this is ridiculous."

172.    Vangel told Sapp to "calm down". Sapp stated that these words "infuriated her" and that she did not like being talked to in a condescending manner.

173.    Sapp told Vangel, "I wish you had our backs like [Gazzano] does."

174.    Vangel retorted that Sapp should email Broadwell if she thought he was not treating her appropriately.

175.    Sapp's response that "[Broadwell] doesn't even know what we do here. All you guys care about is covering your asses."

176. Sapp then turned around in her chair, put her headphones on and ignored Vangel. A few minutes later, Sapp got up to use the restroom and when she returned, Vangel had left for the day.

177. On November 17, 2014, Vangel informed Sapp in person at approximately 1:00pm that a formal counseling statement regarding the incident would be issued to her at a 4:00pm meeting that day.

178. Sapp emailed Vangel requesting a postponement of the meeting to allow her time to prepare for the meeting.

179. Vangel responded via email and denied her request.

180. Sapp also emailed Vangel requesting a copy of the counseling statement in advance of the meeting.

181. Vangel also denied this request.

182. Sapp then emailed Vangel saying that she would like to have Gazzano present at the session.

183. Vangel posed no objection to Gazzano's attendance.

184. Sapp attended the counseling session at 4:00pm and signed the counseling letter, but indicated that she "did not concur" with the issues raised.

185. The week of November 17, 2014, Sapp received a letter of recognition from the Director of the REF, Sliwa, for her outstanding performance and contributions.

**Sapp raises her concerns with HR**

186. In April 2015, Sapp spoke to Sheila Garza in the Office of Human Resources over the phone regarding her concerns over the disparate treatment she encountered at GTRI.

187.     The complaints from Sapp included GTRI's failure (through Vangel and Haran) to provide an adequate room for Sapp to express breast milk, disallowance of schedule flexibility for Sapp but allowance for her male colleagues (as directed by Vangel and Haran), disallowance of teleworking for Sapp but allowance for her male colleagues, lower raise granted to Sapp as compared to her male colleagues, and different standards of evaluation for Sapp as compared to her male colleagues (as stated by Vangel and Broadwell).

188.     Garza told Sapp that none of the actions that she described were illegal or improper.

189.     Garza additionally told Sapp that if an investigation were to be conducted, Garza would have to tell the entire GTRI department at the REF that it was Sapp who was complaining.

190.     Sapp viewed this comment as a veiled threat and declined to have Garza investigate.

**Sapp goes on maternity leave for the second time**

191.     Sapp was on maternity leave again from May 2015 through August 2015.

192.     Sapp's second son was born on May 11, 2015.

193.     Sapp was diagnosed with post-partum anxiety.

194.     Due to the hostility she encountered after her first maternity leave, Sapp did not request accommodations or flex time to deal with her anxiety and depression, instead electing to pursue therapy on her own time.

195.     Sapp was not given credit in her 2015 performance evaluation for her work on the Counter Unmanned Aerial Systems project even though she gave Vangel and Gazzano a detailed analysis of her performance achievements before she took maternity leave in 2015.

196. During the summer 2015, GTRI issued raises to Sapp's team.

197. Herndon informed Sapp that the raises were issued.

198. Shortly before returning from maternity leave, Sapp texted Haran to ask about the raises.

199. Haran refused to give Sapp any information until she returned from maternity leave, citing GTRI's policy.

200. Upon Sapp's return from maternity leave, Gazzano took Sapp aside and informed her that she was ineligible for a raise in 2015 because of "the complaint filed against" her by Vangel in 2014.

201. However, Vangel had yelled at Herndon and Johnson at an assembly in mid-2014 in front of government client representatives. Herndon and Johnson had arrived a bit late for the assembly because they had gone to Starbucks in order to retrieve coffee at the request of the government client, Betty Maguder. Vangel loudly reprimanded them for their tardiness in front of the approximately 75-100 people assembled.

202. His outburst was so brazen, that a government employee at the REF (Maguder) reported the incident directly to Haran. Vangel never received formal counseling regarding the issue. And, Vangel received a raise in 2015.

203. Sapp was not present at the assembly. However, both Herndon and Johnson separately relayed the story of the public reprimand to Sapp.

204. Additionally, Russell Young, one of Sapp's male counterparts, had received a bonus from Haran while Sapp was on maternity leave for finishing a project she had done all of the upfront research for.

205. Sapp received no recognition or bonus for her work on that project.

**Sapp again reports her claims and an investigation is conducted**

206.     In September 2015, Sapp contacted GT's Ombudsman, Leigh Bottomley, to reiterate her claims.

207.     Bottomley suggested she speak with the Title IX office at Georgia Tech.

208.     Bottomley agreed to reach out to the Title IX office on Sapp's behalf and did so in September 2015.

209.     The Title IX office agreed to conduct an investigation.

210.     The Title IX office hired an outside law firm to complete the investigation.

211.     Grace Regan, the outside counsel, conducted the investigation from September 2015 through January 2016.

212.     Regan issued the investigative report to GTRI management in January 2016.

213.     Among other things, the report found that:

> The evidence supports a finding of disparate treatment of Ms. Sapp, on the basis of gender . . . Salty language and profanity, gossip, innuendo and lewd stories are exchanged, contributing to an environment hostile to women . . . Ms. Sapp felt forced to fight for her right to a lactation room . . . "Lack of availability" due to her need to express breast milk in the office was a factor relied upon in reducing the raise given to her in 2014, and was likely a factor in her performance appraisals for 2014 and 2015 . . . Ms. Sapp was not provided the same opportunity to flex her time to attend therapist appointments for the treatment of her postpartum anxiety that male employee such as Mr. Chavers were allowed for their appointments and family obligations . . . The evidence supports a finding that her supervisors are treating her differently due to her having complained, and she has been labeled a "troublemaker".

214.     The investigation also revealed that Haran was engaging in waste, fraud, and abuse on the Government contract.

215.     In an effort to consolidate several contracts into one contract to make contract management easier, the government moved Sapp's position (and the three others in that position) to a new contract supported by another contractor in January 2016.

### Sapp applies for outside positions while Vangel and Haran attempt to sabotage her efforts

216.     Haran and Vangel have provided negative feedback about Sapp to potential employers.

217.     Although Sapp has had positive interviews with several organizations, she has yet to be offered a position or even an explanation for the position not being offered to her.

218.     For example, in January 2016, Sapp interviewed for an available Deputy Program Manager position through Bobby Hall and Shawn Dixon.

219.     Rebeka Melber and several others affected by the REF contract changeover also interviewed for the position. Melber was selected for the Program Manager position over Sapp.

220.     In March 2016, Sapp learned that Shawn Dixon, one of the hiring managers for that position, said that Sapp was the best fit for the position based on the resumes he had considered at that point.

221.     In March 2016, Sapp further learned that the hiring managers for the position also requested assessment feedback from Haran and Vangel by email, but both insisted on telephone conversations to provide this feedback regarding Sapp's suitability for the position.

222.     Further, Sapp's education, experience, and performance made her a substantially better fit for that position than Melber.

223.     By way of further example, Sapp had inquired as to whether Tommer Ender had any availability for her on his team on several occasions between 2013 and 2015. Sapp also

applied for a Biostatistician (Research Scientist I/II Senior Research Scientist) position on about July 3, 2014; an Engineering Program Manager/Associate Project Director position on about July 2, 2014; and a Research-focused Systems Engineer position on about September 27, 2013; all of which fell under Ender's organization. Due to her education and experience, Sapp would have been a good fit for Ender's team.

224.    In March 2016, Sapp learned that in February 2015, Ender asked Jeanne Balsam and Haran to put an end to Sapp's inquiries about working on his team, saying that he tried "delicately" and without "getting [himself] fired, to say that [Sapp's] 'not a fit' for his team."

225.    However, Sapp and Ender had little direct interaction at that point, so he had no legitimate reason to believe that she would not have been a fit for his team.

**Sapp is Terminated**

226.    On Friday, March 25, 2016, Kim Harrington, the Director of Human Resources for the Georgia Institute of Technology, requested to meet with Sapp and informed her that someone from GTRI would be in touch with her in the next twenty four to seventy two hours.

227.    Sapp replied to Kim Harrington, stating, in part:

There are a few things I'd like to bring to your attention in advance of the meeting though. First, I've inferred from your email that GTRI may be presenting me with a termination letter soon. I want to let you know that I've had several conversations with Ron Smith and Jim Cech about GTRI moving me into a business development position for the next six months or so and have told me that I'd be an excellent fit for that position. Jim and Ron are discussing that possibility with Dr. Gerber early next week and hope to have a final resolution by the middle of next week.

Second, I want to bring to your attention the concerns I've had with the way GTRI has treated me over the past several years. I'm sure that you're aware of at least some of these concerns, so I won't go into all of the details now (but, if you'd like, I can discuss this with you further). Over the past several years, I've been concerned that GTRI has been discriminating against me because of my sex in violation of Titles VII and IX of the Civil Rights Act of 1964 and in violation of the Equal Pay Act. I have been denied privileges that my male colleagues

have been granted, such as a flexible work schedule and telework, and I have been denied appropriate pay for my work, despite my male colleagues' higher salaries. I complained about these issues over the course of my tenure to my supervisors and OHR, and formally through the GT Ombuds in August and September 2015. An investigation was conducted into my complaints, as I am sure you are aware. The investigation indicated that I had been treated differently than my male colleagues.

In light of the pending opportunity with the business development team, I cannot see why GTRI has any reason to terminate my employment now.

Third, in January 2015 [*sic*], I interviewed for an available Deputy Program Manager position through Bobby Hall and Shawn Dixon. I learned through Rebeka Melber that she (as well as the others affected by the REF contract changeover) also interviewed and she was selected for the position over me. However, I recently learned that my non-selection for that position was retaliatory. I submitted several open records requests and learned that Shawn Dixon, one of the hiring managers for that position, said that I was the best fit for the position based on the resumes he had considered at that point. The open records requests also showed that the hiring managers for the position also requested assessment feedback from Terence Haran and Ryan Vangel (two of several named in my complaint) by email, but Terence and Ryan insisted on phone conversations to provide this feedback regarding my suitability for the position. These facts that I just learned, when paired with the fact that Rebeka Melber is substantially less qualified for that position than I am, indicates to me that my non-selection for that position was a continuation of the discriminatory treatment that I've faced and that it is in retaliation for my complaints about the treatment I've faced.

228.    On March 29, 2016, Sapp learned that although Dr. Andrew Gerber (GTRI

Director) agreed that the business development opportunity was important, it would not be

available to her.

229.    Also on March 29, 2016, GTRI issued Sapp a letter stating that her employment

would be eliminated as of April 27, 2016 due to a reduction in force.

230.    Kim Harrington had not investigated the concerns Sapp raised as of the time

GTRI issued Sapp her termination letter.

231.    Moreover, GTRI's policies require a sixty to ninety day notice period of a

reduction in force; Sapp was given less than thirty.

232.    However, GTRI could have moved Sapp to a different position instead of terminating her employment.  As of April 7, 2016, GTRI was advertising seven positions for which Sapp was qualified, including the following:

     a.   Research-focused Software Developer (Research Scientist/Engineer I/II, Senior Research Scientist/Engineer) ELSYS- 596

     b.   Research-focused Systems Engineer ELSYS 1048

     c.   ELSYS Analyst ESID 1059

     d.   Human Systems Integration Engineer - ELSYS 1042

     e.   Lab QA Area Lead- 1054

     f.   Radar Research Engineers – SEAL- 943

     g.   Electronic Warfare Analysis and Applications Engineer (Research Engineer/Scientist I/II) ACL- 705.

233.    On April 14, 2016, Sapp submitted an appeal of her termination. In her appeal, Sapp described the discriminatory and retaliatory treatment she faced at GTRI and requested placement in one of the seven positions currently available in lieu of termination.

234.    GTRI never responded to Sapp's appeal of her termination.

**Sapp is denied multiple opportunities for funded work within GTRI**

235.    Prior to being informed by Gerber that the business development position would be unavailable and receiving her termination letter, Sapp had developed a business development strategy in Excel.

236.    On April 21, 2016, one of the GTRI engineers requested Sapp's assistance in creating a briefing for Gerber to discuss business development at the Quantico office. Sapp learned that Gerber had decided to use part of the strategy developed by Sapp.

237.     Gerber denied funding for a business development position for Sapp, yet used the plan she developed.

238.     Further, shortly before the end of Sapp's employment, Alexis Harvey, an engineer at GTRI, was reactivated by her United States Marine Corps unit. On or about April 26, 2016, she asked if Sapp would be interested in filling her position at GTRI.

239.     Sapp immediately emailed Ron Smith, GTRI's Director in Quantico, asking to discuss her suitability for the position.

240.     Besides acknowledging Sapp's email, Smith did not respond to Sapp's inquiry about the position.

241.     The other engineer in consideration for Harvey's position was not a GTRI employee.

242.     However, GTRI's reduction in force policy requires that a current qualified GTRI employee be given the opportunity for work over a qualified non-GTRI employee.

243.     On or about April 26, 2016, Cody Lamb, one of Sapp's colleagues at GTRI in Atlanta, GA, filed an Ethics Point complaint against Haran for retaliation in response to Lamb's cooperation in investigations into the Title IX and Fraud, Waste, and Abuse (FWA) complaints filed against Haran. The complaint alleged that Haran sabotaged Lamb's attempts to obtain another position within GTRI because of Lamb's involvement in the Title IX and FWA complaints against him.

244.     At 11:45 p.m. on April 26, 2016, the day before her termination took effect, Vangel emailed Sapp a document called "Exit Checklist" for her to complete and return to the office of human resources before the end of her last day. The email also instructed Sapp to leave her access key with human resources and sign the termination papers before departing.

245. Previously, all of Sapp's departing colleagues were granted in person interviews with human resources on their final days of employment. None of them were required to complete an "Exit Checklist."

## COUNT I
### The Equal Pay Act of 1963 ("EPA")
### 29 U.S.C. § 206(d)
### Unequal Pay

246. Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

247. Sapp is an "employee" as the term is defined in 29 U.S.C. § 203(e)(2)(ii).

248. GTRI is an "employer" as the term is defined at 29 U.S.C. § 203(d).

249. Sapp performed work that required at least equal, if not more skills, effort, and responsibility, under similar working conditions as those of her male colleagues.

250. Sapp's male colleagues, including Chavers and Wierzba are compensated at a higher salary than Sapp.

251. GTRI knowingly and willfully set Sapp's pay at a level that was substantially below her male colleagues who performed the same work.

252. GTRI failed to compensate Sapp comparable to employees who are of the opposite sex, work in the same "establishment" as Sapp, perform work equal to the work performed by Sapp, and retain positions that required equal skill, effort, responsibility and is performed under similar conditions as compared to Sapp.

253. GTRI ignored Sapp's multiple complaints about her pay disparity and also ignored Sapp's requests that GTRI rectify her pay disparity.

254.     As the direct and proximate result of GTRI's violation of 29 U.S.C. § 206(d),

Sapp was caused to suffer damages.

255.     Furthermore, GTRI's violation of 29 U.S.C. § 206(d) was reckless and willful.

256.     Sapp is entitled to damages in an amount to be determined at trial.

257.     For violations of 29 U.S.C. § 206(d), Sapp demands such legal or equitable relief

as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

      a.   Promotion;
      b.   Economic damages including front and back pay;
      c.   Reasonable attorneys' fees and costs;
      d.   Liquidated damages; and
      e.   Any other relief that this Court deems just and equitable.

## COUNT II
### Title IX of the Education Amendments of 1972
### 20 U.S.C. § 1681 et seq.
### Discrimination by an Educational Entity Based on Gender

258.     Plaintiff incorporates the allegations set forth in the preceding paragraphs as though fully alleged herein.

259.     GTRI is an "educational institution" as this term is defined by 20 U.S.C. § 1681(c).

260.     Sapp is a woman.

261.     Several of Sapp's colleagues, including Herndon, Wierzba, and Chavers are men.

262.     GTRI discriminated against Sapp by treating her differently than similarly situated male GTRI employees performing the same job duties and responsibilities.

263.     GTRI discriminated against Sapp based on her sex by compensating her male colleagues at a higher salary range than her, by refusing to allow her to telework, by refusing to allow her to work an alternate or flexible work schedule, by refusing to issue her a raise commensurate with that of her male colleagues in about June 2014, by interfering with her selection for positions in Atlanta, by issuing her an inappropriate performance evaluation in about August 2014, by disciplining her in October 2014, by refusing to issue her a raise in the summer of 2015, by refusing to issue her a bonus in the summer of 2015, by including inaccuracies in her 2015 performance evaluation, by refusing to select her for positions in January 2016 and in April 2016, by failing to take corrective action on her complaints of discrimination, and by terminating her employment.

264.     GTRI discriminated against Sapp based on her sex when they resisted her lawful right to procure a designated room in which to express breast milk.

265.     GTRI's discrimination against Sapp was intentional.

35

266. GTRI had no legitimate business reasons for the adverse actions it took against Sapp.

267. GTRI's stated reasons for its adverse actions against Sapp are pretext for discrimination.

268. Sapp has been damaged by GTRI's discriminatory acts.

269. Sapp is entitled to damages in an amount to be determined at trial.

270. For violations of 20 U.S.C § 1681(b), et seq., Sapp demands such legal or equitable relief as provided by 20 U.S.C § 1681(b), et seq., including, but not limited to, the following:

    a. Promotion;
    b. Economic damages including front and back pay;
    c. Reasonable attorneys' fees and costs;
    d. Compensatory damages;
    e. Punitive damages; and
    f. Any other relief that this Court deems just and equitable.

**COUNT III**
**Title IX of the Education Amendments of 1972**
**20 U.S.C. § 1681 et seq.**
**Retaliation by an Educational Entity**

271. Sapp hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

272. Sapp engaged in protected activity under Title IX by complaining about the fact that she was being subject to gender discrimination on multiple occasions as detailed above.

273. GTRI did not fully investigate all of Sapp's complaints and took no action to correct the concerns Sapp raised or take any action to intervene in the discrimination she faced.

274. The decisionmakers involved in the adverse actions against Sapp knew of her complaints of discrimination to GTRI.

275. GTRI retaliated against Sapp for her complaints by interfering with her selection for positions in Atlanta, by refusing to issue her a raise in the summer of 2015, by refusing to issue her a bonus in the summer of 2015, by including inaccuracies in her 2015 performance evaluation, by refusing to select her for positions in January and April 2016, by failing to take corrective action on her complaints of discrimination, and by terminating her employment.

276. GTRI had no legitimate business reasons for the adverse actions it took against Sapp.

277. GTRI's stated reasons for its adverse actions against Sapp are pretext for retaliation.

278. Sapp has sustained damages as a result of GTRI's unlawful retaliation in violation of Title IX, including, but not limited to, lost wages, lost opportunity to increase her wages, lost bonuses, lost opportunity to increase her bonuses, damage to her career, and emotional, mental, and physical distress and anxiety.

279. Sapp is entitled to such legal or equitable relief as will effectuate the purposes of Title IX, including but not limited to the following:

   a. Retention;
   b. Promotion;
   c. Economic damages including front and back pay;
   d. Reasonable attorneys' fees and costs;
   e. Compensatory damages;
   f. Punitive damages; and
   g. Any other relief that this Court deems just and equitable.

**COUNT IV**
**Rehabilitation Act**
**29 U.S.C. § 701, *et seq*.**
**Discrimination**

280. Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

281. The Rehabilitation Act prohibits discrimination against employees on the basis of disability.

282. A disability for purposes of the Rehabilitation Act is a physical or mental impairment that constitutes or results in a substantial impediment to employment, or a physical or mental impairment that substantially limits one or more major life activities of such individual.

283. A qualified individual is, for purposes of the Rehabilitation Act, an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

284. Under the Rehabilitation Act, pregnancy is considered a disability.

285. Under The Rehabilitation Act, post-partum depression is considered a disability.

286. At all times relevant to this complaint, GTRI was aware that Sapp had been pregnant and suffered from post-partum depression, particularly in 2015.

287. GTRI disparately treated Sapp because of her disability when it by interfering for her selection for positions in Atlanta, by refusing to issue her a raise in the summer of 2015, by refusing to issue her a bonus in the summer of 2015, by including inaccuracies in her 2015 performance evaluation, by refusing to select her for positions in January 2016 and April 2016, by failing to take corrective action on her complaints of discrimination, and by terminating her employment.

288. GTRI had no legitimate business reasons for the adverse actions it took against Sapp.

289. GTRI's stated reasons for its adverse actions against Sapp are pretext for discrimination.

290.     Sapp has sustained damages as a result of GTRI's unlawful discrimination in violation of the Rehabilitation Act, including, but not limited to, lost wages, lost opportunity to increase her wages, lost bonuses, lost opportunity to increase her bonuses, damage to her career, and emotional, mental, and physical distress and anxiety.

291.     Sapp is entitled to such legal or equitable relief as will effectuate the purposes of the Rehabilitation Act, including but not limited to the following:

a.  Retention;
b.  Promotion;
c.  Economic damages including front and back pay;
d.  Reasonable attorneys' fees and costs;
e.  Compensatory damages;
f.  Punitive damages; and
g.  Any other relief that this Court deems just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Julie Sapp prays this Honorable Court for judgment against the Defendant, in the amount of economic damages and liquidated damages, compensatory damages, equitable relief (including upgrading Plaintiff's employment status), punitive damages, reasonable attorney's fees and costs of this action, and any other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Julie Sapp demands a trial by jury for any and all issues proper to so be tried.

Plaintiff Julie Sapp
*By Counsel*

Dated: May 27, 2016

R. Scott Oswald
VSB# 41770
Andrea M. Downing
VSB# 79584
The Employment Law Group, P.C.
888 17th Street, NW, 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
adowning@employmentlawgroup.com
*Counsel for the Plaintiff Julie Sapp*

40